**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

COMCAST CABLE COMMUNICATIONS, )
LLC d/b/a XFINITY, and COMCAST )
CORPORATION, )
)    CIVIL ACTION
     Plaintiffs, )
)    CASE NO. _____
v. )
)    <u>**JURY TRIAL DEMANDED**</u>
DTVVCONNECT, LLC, CHICAGO PREP & )
PROMO, LLC, SPTRMCHRG, LLC, )
LAWEEZON SOLUTIONS, LLC, MOHSIN )
AKRAM, SADAF AMBREEN, XYZ )
COMPANIES 1-10, and JOHN DOES 1-10, )
)
     Defendants. )
_____

<u>**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**</u>

Plaintiffs Comcast Cable Communications, LLC d/b/a XFINITY and Comcast Corporation (collectively, "Plaintiffs" or "XFINITY"), sue Defendants DTVVConnect, LLC, Chicago Prep & Promo, LLC, Sptrmchrg, LLC, Laweezon Solutions, LLC, Mohsin Akram, Sadaf Ambreen, XYZ Companies 1-10, and John Does 1-10 (collectively, "Defendants") and state:

**BACKGROUND**

1.     Since learning that fraudsters, like Defendants, are using its name to defraud consumers, XFINITY has been taking steps to combat the extremely harmful scheme. For example, XFINITY expends significant resources to respond to existing and potential customer complaints of imposter fraud scams. In addition to attempting to salvage the customer relationships damaged by fraudsters, XFINITY collects and analyzes the data provided in customer reports of imposter fraud. XFINITY also works with law enforcement, regulators, and industry groups to combat imposter fraud schemes. It routinely posts and circulates fraud alerts for its customers and the public on its websites, in an effort to educate consumers to be alert to the potential dangers of

fraud. Finally, XFINITY dedicates substantial internal resources, as well as hiring external investigators and retaining the undersigned counsel to take legal action to pursue those perpetrating imposter fraud schemes.

2.     Defendants are engaged in a scheme to impersonate XFINITY in an effort to defraud unknowing consumers in the United States into providing them with payments, usually by check or via PayPal, believing that they are: obtaining discounted or free XFINITY services, paying their XFINITY account balance or upgrading their XFINITY equipment (hereinafter the "Imposter Fraud Scheme" or the "Scheme"). This action seeks to end this ongoing fraudulent scheme by Defendants and their co-conspirators against XFINITY, and its existing and potential customers, and to compensate Plaintiffs for damages caused by this fraud.

3.     Comcast Corporation is a global media and technology company with two primary business categories: Connectivity & Platforms and Content & Experiences. Under Connectivity & Platforms, Comcast Cable Communications, LLC is a leading provider of broadband, video, voice, wireless, and other services to customers in the United States under the XFINITY brand. For nearly 60 years, the Comcast family of companies has invested significant time and resources to become a household name. To maintain its position in the market, Comcast is continuously developing and updating its network, technologies, video programming offerings, and customer experience, providing best-in-class services, content, and digital entertainment offerings. Its reputation as one of the largest communications and media companies in the country makes it a target for fraud, like that perpetrated by Defendants.

4.     Defendants and their co-conspirators are perpetrators of the Imposter Fraud Scheme, in which they misuse XFINITY's name and reputation for their personal financial gain. After engaging existing or potential XFINITY customers to offer them fictional free or significantly discounted XFINITY services or products, demanding payment on their XFINITY

2

accounts, and/or threatening to terminate their XFINITY service if they do not purchase equipment upgrades, Defendants take the consumer's money, typically in the form of PayPal payments or physical or electronic checks. They keep the PayPal payments and launder the checks, using the bank account information for additional nefarious purposes. Having successfully duped the consumers, they disappear with the money. Defendants leave the consumers confused, angry, and without the promised free or discounted XFINITY products and/or services or account credit, harming both the consumers and Plaintiffs.

5.     As with most imposter fraud schemes, Defendants' Imposter Fraud Scheme involves a number of steps and co-conspirators, but follows repeated patterns:

a.     Fraudsters identify existing, former, or potential XFINITY customers who may be in the market for digital entertainment services (*e.g.*, people moving, new homebuyers, or those looking to install televisions and/or home entertainment systems). The fraudsters often create fake websites to collect consumer information or they scrape the dark web to identify the information of viable consumer targets for the Imposter Fraud Scheme. Then they either sell the lead lists to other fraudsters or contact these consumers themselves, by text message or phone call using Voice over Internet Protocol (VoIP) service. VoIP dramatically decreases the cost of making such calls and allows them to manipulate their Caller ID, including to falsely read "XFINITY" or "Comcast."

b.     When an individual responds, the fraudsters impersonate XFINITY representatives and tell the consumer that they have been selected for a special, time-sensitive XFINITY promotion that is about to expire, thus requiring the consumer to act quickly. It is common for the fake promotion to offer 50%-80% off XFINITY service for between 6-24 months or even for life, and sometimes include free premium channels to make the purported deal more attractive. Existing or former XFINITY customers are told

3

that they are being offered a special bill pay discount that will reduce their current XFINITY account balance, but only if they immediately make a payment. Under another fraud ploy, the fraudsters threaten to disrupt XFINITY customers' services if they do not immediately pay to "upgrade" their equipment—either through a device that is promised to be delivered in the next several business days or through a "required remote upgrade" to their current equipment. Customers may receive multiple subsequent calls, each time seeking more money for "additional necessary upgrades," each accompanied by the threat that they will lose their XFINITY service if they do not act.

        c.      Once the consumer is deceived, the fraudsters elicit personal identification information, and, if the consumer is already an XFINITY customer, gather the customer's account access information. In the case of an existing customer, the fraudsters put the customer on hold while they use the identification information provided by the customer to unlawfully access the individual's XFINITY account, sometimes making a full or partial "payment" on a stolen credit card or adding premium channels to the account (at full cost) to add credibility to the fraud.

        d.      When prepaid cards are sought in payment, the fraudster tells the consumer that the promotion is in partnership with another company, such as Target, and, therefore, to qualify for the benefits of the dramatic discount, the customer will need to prepay the discounted amount due in prepaid cards issued by the promotion partner. The consumer is provided a total amount to acquire in prepaid cards, another number to call with the prepaid card information, and the fraudster's "employee number." The consumer rushes out to buy prepaid cards, calls the number provided by the fraudster, which is answered "XFINITY," and provides the prepaid card information. The fraudster immediately drains the prepaid cards of funds.

e.     Fraudsters are also increasingly looking for payment in the form of credit cards, physical checks and echecks, as they can not only collect money under the Imposter Fraud Scheme, but also target the entire bank account or credit line. They attempt to make charges or drain the account's funds, or they resell the credit card information or images of the checks online, for other fraudsters to use. In the case of checks and credit cards, the fraudsters prevent anticipated holds or reversed charges by misrepresenting that they are an authorized partner of XFINITY, and warning the consumer not be confused or alarmed by a different name on the charge.

f.     The consumer never receives the promised promotions, bill credit or equipment. Instead, victims of the Imposter Fraud Scheme call XFINITY Customer Care confused and angry and demand the promotion or a bill reduction or they will terminate their service. Others recognize and are embarrassed that they were scammed, but nonetheless associate XFINITY with the experience and quietly move to another provider. Even consumers who did not fall victim to the fraud contact XFINITY Customer Care to report the Scheme, and/or report their negative opinion of XFINITY, thereby using valuable Comcast time and resources. Still others targeted for this fraud report their negative opinion of XFINITY on Comcast's online customer support forum or public websites dedicated to consumer complaints, such as nomorobo.com, 800notes.com, and scammer.info.

6.     Although the fraudsters engaged in the XFINITY Imposter Scheme may collect customer information on the dark web, they openly do business in Facebook groups, LinkedIn chats, and on employment websites such as Upwork. They talk openly about needing scam scripts; merchants to launder payments; lists of customer information; VoIP services; computer software "portals" that keep track of calls and payments; and employees to run their scams, which they call

5

"campaigns." Examples of such communications are attached as **Exhibit A**. The fraudsters brag about their experience and expertise and highlight their specialties with particular imposter fraud scams. *See id*. While most call centers are located in Pakistan, many of the call center owners, like Defendants, and the VoIP providers are located in the United States, as are the companies that ultimately cash out check payments.

7.      Unfortunately, in today's e-commerce world, imposter fraud has grown tremendously, particularly in the last few years. According to the FTC in its most recent report on the topic, consumer-reported fraud grew 70% between 2020 and 2021, for a total of $5.8 billion in consumer losses. The FTC received over 2.8 million consumer reports of fraud in 2021 "with the most commonly reported category once again being imposter scams." https://www.ftc.gov/news-events/news/press-releases/2022/02/new-data-shows-ftc-received-28-million-fraud-reports-consumers-2021-0 . In the first 9 months of 2021, consumers reported losing $148 million in prepaid card scams, like the one at issue here. https://www.ftc.gov/news-events/news/press-releases/2021/12/ftc-data-show-major-increase-gift-cards-scam-payment-meth_od. There is no industry or government agency, and virtually no large, well-known company, which has not been the target of imposter fraud. The Imposter Fraud Scheme aimed at XFINITY and its customers has been the subject of news reports. *See, e.g.*, https://www.youtube.com/watch?v=8XFzUwo3Wf8,https://www.consumeraffairs.com/news/are-you-an-XFINITY-customer-then-look-out-for-this-scam-04_0423.html.

8.      In addition to violating numerous state laws and common law rights of XFINITY and its customers, in perpetrating the Imposter Fraud Scheme, Defendants are engaged in an unlawful enterprise to access XFINITY's protected computer systems, traffic in protected and confidential computer passwords, willfully infringe Comcast Corporation's trademarks, and falsely impersonate and advertise as XFINITY.

6

9.     The Imposter Fraud Scheme causes substantial harm to XFINITY and its customers. In addition to the pecuniary losses and costs associated with addressing the Scheme, the misconduct by Defendants and their co-conspirators significantly harms XFINITY's relationships with its customers and others. For example, legitimate customers who are targeted by Defendants and their co-conspirators are distressed and blame XFINITY, the company whose name Defendants co-opted in perpetrating their theft. XFINITY is also forced to defend demands and lawsuits based not on its own acts, but on Defendants' and their co-conspirators' false advertising, impersonation, and other unlawful acts. Defendants cause substantial financial losses as well as damage to XFINITY's brand, image, and relationships.

10.     XFINITY values its hard-earned reputation as a leading provider of communications and media services and holds its customers in the highest regard. Filing this lawsuit, and others like it, is an important aspect of XFINITY's ongoing commitment to protect its brand and its customers from those that seek to profit from the illegal Imposter Fraud Scheme.

11.     XFINITY seeks to recover damages for ongoing harm suffered as a result of Defendants' Imposter Fraud Scheme and to obtain an injunction prohibiting Defendants from continuing to engage in the Scheme.

12.     All conditions precedent to this action have been performed, waived or excused.

13.     Plaintiffs have retained the undersigned attorneys to represent them in this action and have agreed to pay their attorneys a reasonable fee for their services.

**PARTIES, JURISDICTION, AND VENUE**

14.     Plaintiff Comcast Cable Communications, LLC d/b/a XFINITY ("XFINITY"), is a Delaware limited liability company that maintains its principal place of business in Philadelphia, Pennsylvania.  The sole member of Comcast Cable Communications, LLC is Comcast Holdings Corporation, a Pennsylvania corporation with its principal place of business in Philadelphia,

7

Pennsylvania. Comcast Holdings Corporation is a wholly-owned direct subsidiary of Comcast Corporation.

15.     Plaintiff Comcast Corporation ("Comcast") is a Pennsylvania corporation, with its principal place of business in Philadelphia, Pennsylvania.

16.     Defendant DTVVConnect, LLC ("DTVV") is an Illinois limited liability company. DTVV's principal address is 4462 W. Greenleaf Ave., Lincolnwood, IL 60712, which is the residence of Mohsin Akram and Sadaf Ambreen. DTVV was involuntarily dissolved on July 12, 2024. As reflected in documents maintained by the Illinois Secretary of State, Defendant Mohsin Akram was the Manager for DTVV. Upon information and belief despite being involuntarily dissolved, DTVV is still being used in the Imposter Fraud Scheme and is still actively engaged in the Scheme.

17.     Defendant Chicago Prep & Promo, LLC ("Chicago Prep") is an Illinois limited liability company. Chicago Prep's principal address is the same as DTVV, which is 4462 W. Greenleaf Ave., Lincolnwood, IL 60712, which is the residence of Mohsin Akram and Sadaf Ambreen. Chicago Prep was involuntarily dissolved on September 13, 2024 Upon information and belief, despite being involuntarily dissolved, Chicago Prep is still being used in the Imposter Fraud Scheme and is still actively engaged in the Scheme. As reflected in documents maintained by the Illinois Secretary of State, Defendant Mohsin Akram is the Manager for Chicago Prep.

18.     Defendant Sptrmchrg, LLC ("Sptrmchrg") is an Illinois limited liability company. Sptrmchrg's principal place of business is 2600 W. Peterson Ave., Suite 203, Chicago IL 60659, which is the previous residence of Mohsin Akram and Sadaf Ambreen. Sptrmchrg was involuntarily dissolved on May 12, 2023. Upon information and belief despite being involuntarily dissolved, Sptrmchrg is still being used in the Imposter Fraud Scheme and is still actively engaged

in the Scheme. As reflected in documents maintained by the Illinois Secretary of State, Defendant Mohsin Akram is the Manager for Sptrmchrg.

19.     Defendant Laweezon Solutions, LLC ("Laweezon") is an Illinois limited liability company. Laweezon's principal place of business is 2600 W. Peterson Ave., Suite 203, Chicago IL 60659, which is the previous residence of Mohsin Akram and Sadaf Ambreen. Laweezon was involuntarily dissolved on February 10, 2023. Upon information and belief, including its active website, despite being involuntarily dissolved, Laweezon is still being used in the Imposter Fraud Scheme and is still actively engaged in the Scheme. As reflected in documents maintained by the Illinois Secretary of State, Defendant Mohsin Akram is the Manager for Laweezon and Sadaf Ambreen is a Member.

20.     Defendant Mohsin Akram ("Akram") is an individual residing in Lincolnwood, Illinois.  Upon information and belief, Akram is a member and principal of DTVV, Chicago Prep Sptrmchrg, and Laweezon, and is personally engaged in, and helps facilitate, the improper conduct described herein.

21.     Defendant Sadaf Ambreen ("Ambreen") is an individual residing in Lincolnwood, Illinois. Upon information and belief, Ambreen is a member and principal of Laweezon, and is personally engaged in, and helps facilitate, the improper conduct described herein.

22.     Upon information and belief, yet to be identified Defendants John Does 1-10 are present and/or doing business in Illinois and are engaged in illicit conduct and business transactions in Illinois, as alleged herein.  The identities of the various John Doe defendants are not presently known to Plaintiffs and the Complaint will be amended to include the name or names of these individuals as such information becomes available.

23.     Upon information and belief, yet to be identified Defendants XYZ Companies 1-10, through their agents, servants, and employees are present and/or doing business in Illinois, and

9

are engaged in illicit conduct and business transactions in Illinois, as alleged herein. The identities of such Defendants XYZ Companies are not presently known to Plaintiffs and the Complaint will be amended to include the names of the actual defendants as such information becomes available.

24.     Upon information and belief, at all times relevant hereto, Defendants failed to observe the corporate formalities required by law, acted as a single entity, and shared resources and corporate infrastructure, including, but not limited to computer services, telephone numbers, employees, and office space. Accordingly, each Defendant is liable for the acts and omissions of every other Defendant pursuant to piercing of the corporate veil, among other legal principles.

25.     Each Defendant is the partner, joint venturer, accomplice, agent, and alter ego of each of the other Defendants.

26.     Each Defendant is equally liable in relation to the illegal activities described herein on the basis of that Defendant's material participation in the Scheme.

27.     Jurisdiction in this Court is proper pursuant to 28 U.S.C. §§1331, 1332, and 1338 because Plaintiffs' claims for violation of the United States Trademark Act, Title 15 of the United States Code and the Computer Fraud and Abuse Act, 18 U.S.C. §1030, *et seq*., arise under federal law, and because diversity exists between the parties and the amount in controversy exceeds $75,000 exclusive of costs, fees, and interest. Pursuant to 28 U.S.C. §1367, this Court has supplemental jurisdiction over Plaintiffs' state law claims because those claims are so related to the federal claims that they form part of the same case or controversy.

28.     Defendants are subject to the personal jurisdiction of this Court because they reside in Illinois, regularly transact business in Illinois, and/or committed tortious acts in Illinois.

29.     Venue is proper pursuant to 28 U.S.C. §1391(b) because Defendants reside in this District and/or a substantial part of the events or omissions giving rise to the claims occurred in this District.

10

## XFINITY BUSINESS MODEL

30.     XFINITY provides broadband Internet access, video, voice, wireless, security, home automation, and other services, individually and as bundled services at a discounted rate, to over 30 million customers in the United States. They provide these customers with the highest quality services with innovative pricing plans and self-service tools.

31.     XFINITY provides its customers with the choice of watching digital entertainment from virtually anywhere – on televisions at home, on computers using the XFINITY streaming service or on mobile devices via the XFINITY mobile app. In addition to its basic channel lineup, XFINITY offers, *inter alia*, On Demand titles and premium channels. Customers tailor their programming packages to meet their needs and can pay for their XFINITY service by debit or credit card, check, money order, ACH transfer, or by cash at a local XFINITY store.

32.     In addition to being available online and through telesales, XFINITY products and services are available through authorized XFINITY dealers and retailers in the United States.

33.     XFINITY's business model is based upon the ability to deliver affordable, quality products and services to consumers. From time to time, XFINITY provides financial incentives to attract new customers and retain current customers, *e.g.*, prepaid cards, free Wi-Fi equipment for a certain period of time, or Peacock Premium service at no charge. XFINITY is able to recoup these incentives through revenue earned on the monthly services it provides. However, XFINITY has never offered a promotion under which its customers can reduce the cost of their entertainment package by 50% or more. Nor has XFINITY ever represented to or threatened its customers that their XFINITY service will stop functioning if they do not immediately pay to "upgrade" their equipment.

34.     XFINITY's unique products and services, combined with its reputation and state-of-the-art technology, make it a target for the Imposter Fraud Scheme being conducted by Defendants' and their co-conspirators.

**PLAINTIFFS' TRADEMARK RIGHTS**

35.     Comcast Corporation owns the standard character COMCAST® and XFINITY® marks and the stylized XFINITY® and X® marks (collectively, the "XFINITY Marks"). A detailed chart summarizing Comcast Corporation's U.S. federal trademark registrations is attached as **Exhibit B**.[1]  The stylized XFINITY® and X® marks are depicted below:



36.     As a result of the high quality of XFINITY's products, services, sales, promotion, and advertising thereof, the XFINITY Marks have become an intrinsic part of the valuable goodwill and property of Comcast Corporation. The XFINITY Marks are well known and established to customers and the trade as symbols identifying and distinguishing XFINITY's products and services, and signifying distinctive products and services of high quality. Only Plaintiffs and their authorized, affiliated agents or partners are permitted to use the XFINITY Marks.  The XFINITY Marks are valid, distinctive, protectable, famous, have acquired secondary meaning, and are associated exclusively with Comcast Corporation.

37.     Defendants are not in any way or for any purpose affiliated with Plaintiffs and, therefore, cannot lawfully use the XFINITY Marks.

---

[1]     Copies of the Certificates of Registration (where applicable), TSDR status pages, and ownership status pages for the Comcast Marks issued by the United States Patent and Trademark Office are attached as **Composite Exhibit C**.

38.     Defendants are not authorized to use the XFINITY Marks in any way or for any purpose.

39.     Defendants' unlawful use of the XFINITY Marks began after the XFINITY Marks became famous and acquired distinctiveness.

## DEFENDANTS' MISCONDUCT

40.     Although each Defendant and co-conspirator may participate in less than all of the steps in the Imposter Fraud Scheme, they are necessarily reliant on each other to execute and profit from the Imposter Fraud Scheme. Therefore, every act by a Defendant and/or co-conspirator in furtherance of the conspiracy renders that Defendant or co-conspirator liable to XFINITY for the harm caused by the entire Imposter Fraud Scheme.

41.     The Imposter Fraud Scheme includes the following bad actors:

a.     **Lead List Generators and Traffickers**.  Lead Lists are lists of purported XFINITY customers, usually with personal information such as name, phone number, address, account number, balance, and any other information the generators can gather. They collect this information in several ways, including through social engineering texts or calls to consumers, phishing emails and websites intended to lure consumers to submit their information, and by scouring the dark web for relevant information. Once the Lead List Generators gather and sort sufficient customer data, they sell the lead lists to Call Centers.

b.     **Call Centers**.  Call Centers, like Defendants, are the entities that utilize the Lead Lists to contact current and prospective XFINITY customers. The individuals at the Call Centers dial the numbers on the Lead List and follow a script to convince consumers to provide them with money – usually credit or prepaid cards or physical or e-checks, and occasionally PayPal payments – in exchange for free or significantly discounted XFINITY services, upgraded equipment or to pay their XFINITY bills.

c.    **Co-working Space/Portals**.  Some Call Centers do not have their own space from which to make calls. Instead, they rent space in a facility dedicated to accommodating imposter scams. A "co-working" facility provides the Call Center with a furnished room, computers, internet connection, and headsets. A "portal" provides a ready-made Imposter Fraud Scheme, including software to track calls and incoming funds, and will often provide a "clean" IP address and Lead Lists –the Call Center team then starts dialing unsuspecting consumers.

d.    **Merchants**. Once the Call Centers have convinced existing or prospective XFINITY customers to provide them with monies, the payments are laundered through a Merchant. The Merchant collects the card or check information, typically through a web interface or through an email or chat message, and disburses funds to the Call Centers through PayPal, cryptocurrency, Western Union, Zelle, MoneyGram, and similar electronic payment methods. The Merchant can take as much as half of the amount being laundered as a fee, depending on the level of complexity or risk.  The Merchant then uses companies like PayPal, Authorize.net, and Elavon, to cash out the checks and card payments and may resell the customer credit card or banking information to other fraudsters.

e.    **VoIP Service Providers**. VoIP service, or Internet protocol-based dialing, is essential to the Imposter Fraud Scheme. VoIP allows Lead List Generators and Call Centers to dial U.S. consumers from anywhere in the world at a *de minimis* cost, and to change the caller ID to conceal and misrepresent their identities. While some fraudsters may sidestep protocols implemented by well-meaning VoIP providers, other VoIP providers intentionally turn a blind eye to Defendants and their co-conspirators exploiting their platform, and still others purposefully service and profit from this fraud. *See, e.g.,* https://www.ftc.gov/news-events/news/press-releases/2024/01/xcast-labs-will-be-banned-

14

sup porting-illegal-telemarketing-practices-settle-ftc-charges-it-assisted (VoIP settles $10M FTC case for $10M for acting as a gateway for fraud calls even after being warned of the illegal traffic.)

42.     Defendants and their co-conspirators are knowingly and willfully engaged in the Imposter Fraud Scheme. Because of the nature of fraud schemes, the full extent of Defendants' Imposter Fraud Scheme activities is not yet known, however, Defendants are actively involved in several integral components of the conspiracy, including operating call centers that specialize in XFINITY promotional, billing, and equipment upgrade scams, which are discussed *infra*.

43.     XFINITY believes it has uncovered a small fraction of the fraud perpetrated by Defendants against XFINITY and its customers.

44.     Since at least June 2022, Defendants have been engaged in the Imposter Fraud Scheme, targeting Plaintiffs and their customers with equipment upgrade and discounted services scams. Before focusing on XFINITY and its customers, Defendants had run a similar Imposter Fraud Scheme targeting DIRECTV and its customers. Defendants lure consumers interested in saving money on internet and cable services through their many websites or via direct calls, and then, posing as XFINITY or an authorized XFINITY partner, offer them dramatic discounts on new or existing service packages, promotional pricing for other XFINITY services (*e.g.*, Xfinity Mobile phone services), or demand payment to "upgrade" customer equipment or risk losing service.

45.     Defendants Akram and Ambreen rotate through companies, websites, and phone numbers to defraud consumers, and then use the information obtained from consumers, to defraud XFINITY. Defendants' primary phone number, 772.224.8288, has a caller ID that identifies as "Promotion Department." Four (4) additional numbers operated by Defendants have been specifically and repeatedly identified as engaged in the Imposter Fraud Scheme. In addition to the

Defendant corporations identified, Defendants Akram and Ambreen operate other corporations, active and inactive, in Illinois. The websites operated by Defendants include dtvvconnect.com, sptrmchrg.com, chicagopreppromo.com, and dtvvprom.com, among many others. Defendants shutter or sell their websites once they are no longer productive and open new ones.

46.     To date, at least 219 customers have reported being targeted by Defendants and their co-conspirators in their Imposter Fraud Scheme. On information and belief, this is only a fraction of the XFINITY customers subjected to Defendants' Scheme and Defendants' efforts to defraud XFINITY. The reports are made to XFINITY and on websites dedicated to identifying fraudsters targeting consumers (*e.g.*, 800notes, Scammer.info, Nomorobo, and Robokiller). Customers identify Defendants by name and/or by their primary telephone number 772.224.8288.

47.     Defendants used a variety of "promotions" to trick customers into paying Defendants money for, what they believed to be, their XFINITY accounts. For example, one customer was offered $50 off/month XFINITY cable service with a one-time equipment upgrade fee; another was provided a "promotion" that required the internet-only customer to purchase other XFINITY services. In another example, Defendants contacted an XFINITY customer and after providing the maiden name of the customer's mother, they convinced him they were XFINITY and he provided his name, address, and the last four digits of his social security number. Samples of the many reports of Defendants' fraud include:



48.     In another instance, an XFINITY customer demanded reimbursement for the $800 that she lost to Defendants, who posed as XFINITY and offered her a "promotion" for seniors prepaying for service. Another customer reported being the target of Defendants' "elderly customer discount" scam for XFINITY service. Other customers reported Defendants' calling as "Comcast" and indicating they either must upgrade their equipment or lose their XFINITY service, or, that they qualified for an equipment upgrade. One customer reported paying Defendants $100 for the "upgraded box" only to find that the piece of equipment he received did not provide the existing services or channels on his XFINITY account and there was now a bank account he did not recognize tied to his XFINITY account. Many customers reported being fearful not just of having lost money but of having been tricked into providing Defendants with their personal information, including the last four digits of their social security numbers.

49.     On information and belief, Defendants and their co-conspirators use the personal information that they gather from unsuspecting customers to pose as the customers to XFINITY. They defraud XFINITY by posing as the customer. Defendants represent that they are the customer and relay, in real time, the confidential protected account information that they are gathering from the customers to make changes in the account such as changing passwords, adding or removing services or devices, and changing payment methods, authorized users, and associated phone numbers.

50.     Once Defendants have duped consumers into believing that they are making a payment to XFINITY, customers are directed by Defendants to pay for the fake equipment upgrades or discounted XFINITY services either by sending physical checks to Defendants' P.O. Box in Chicago or through PayPal. One customer reported being a repeated target of Defendants, who, after mailing a check for $180 to Defendants' P.O. Box for XFINITY service, received numerous harassing calls from Defendants seeking more money, claiming each time to be from Comcast and offering $40 off their XFINITY bill.

51.     On November 1, 2023, an investigator for XFINITY called Defendants at the 772.224.8288 number. The phone was answered by a man who identified himself as Comcast. The investigator inquired into the 50% off promotion on Comcast cable that had been reported by other of Defendants' victims. After collecting the investigator's name, address, account-number, and billing information, the "agent" attempted to initiate a multi-factor authentication (MFA) code to the investigator's phone. When the investigator indicated that the phone associated with the XFINITY account was not present, the "agent" redirected the conversation and asked whether the investigator had Comcast service issues, to which the investigator responded yes. Defendants' "agent" then stated that the investigator qualified for a "discounted equipment upgrade" for $100. According to Defendants' "agent," after payment, the investigator would be contacted to schedule

18

installation of the new XFINITY equipment. Payment was made; however, the investigator was never contacted by Defendants to "schedule the new XFINITY equipment" and the investigator's many follow-up calls went unanswered. No payment was credited to the investigator's account and no equipment was received.

52. The investigator paid the $100 for the purported Comcast "equipment upgrade" through PayPal, which was submitted to Defendant DTVV. While the text invoice and link was in the name of DTVV at Defendants' P.O. Box, the PayPal receipt was in the name of sister company Defendant Sprtmchrg[2]. The receipt identified DTVVConnect, LLC, telephone number 217.759.3684 and email address sptrmchrg001@gmail.com , which is registered to Defendant Akram. The PayPal email gookarianbiz@gmail.com is also registered to Defendant Akram.



Invoice                    Receipt

---

[2]   The reference to "Sprtmchrg" as the reference name in billing statements is likely an allusion to "Spectrum Charge," in an effort to lend validity to the charge. There is also a consumer report of having made a payment to Defendants of $100 believed to be for three months of free DIRECTV service.

53.     It is evident that Akram and Ambreen established a very effective imposter fraud operation based in the Chicago area that has been operating for years. As part of that Scheme, they open and abandon corporations and websites. For example, Defendant Laweezon was incorporated in August 2019 and abandoned in February 2023, shortly before several other companies were formed to take its place. On the laweezonsolution.com website, Defendants tout their discounted "Voice, Internet, Cable TV and IPTV" services, which are provided under the "best promotions" for "current or new" service, particularly to "reduce current bills and upgrade hardware and software." While the company purportedly closed in early 2023, its website was updated in 2024. In support of their "services" and to lure in customers, Defendants provide the following "Testimonials:"



54.     DTVV was established in January 2021 and was abandoned in 2024. Defendant Chicago Prep & Promo, LLC was established in March 2023 and abandoned in September 2024, however, its website www.chicagopreppromo.com, and telephone number 312.776.4084, remain active. Upon information and belief, the Chicago Prep & Promo website, like the Laweezon website, is a shell that acts as bait to collect consumer information for Defendants' own use or to compile consumer Lead Lists to sell to other Call Centers.

55.     Defendant Sptrmchrg was incorporated in November 2021 and was abandoned in May 2023, shortly after Defendant Chicago Prep & Promo came into existence. Notably, despite being involuntarily dissolved six months earlier, Sprtmchrg was still transacting business in November 2023, as reflected in the PayPal transaction with the investigator for XFINITY.

56.     Defendants operate numerous other companies, websites and phone numbers, some of which have been retired by Defendants, such as Ecomlux, LLC and Hudstar, LLC, which were opened in September and July, 2021, respectively, and abandoned in March and January 2023, respectively.

57.     Upon information and belief, Defendants use their phone numbers, websites, and companies interchangeably and as co-conspirators to further their Imposter Fraud Scheme and frequently change or add new phone numbers, websites, and company names to conceal their unlawful activities and hide assets.

58.     Defendants and their co-conspirators utilize numerous individuals and companies throughout the United States and around the world to conduct their Imposter Fraud Scheme and, by the complex nature of a fraud scheme, their unlawful transactions are concealed. As such, discovery in the United States and overseas, including third party depositions and written discovery, will be necessary to identify all of Defendants' co-conspirators, determine the extent of

their unlawful activities, and to quantify the totality of harm they caused XFINITY, its customers, and United States consumers.

## SUBSTANTIAL HARM CAUSED BY DEFENDANTS' MISCONDUCT

59.     Defendants' actions substantially harm XFINITY in several ways, including *inter alia*: (1) Defendants' actions seriously and irreparably interfere with XFINITY's relationships with its customers and partners; (2) Defendants' false advertising and infringement of the Comcast and XFINITY names and XFINITY Marks cause significant ongoing and irreparable losses and harm to XFINITY's goodwill, image, and reputation; (3) XFINITY is deprived of the opportunity to earn profits by providing products and services to and collecting payments from legitimate XFINITY customers; (4) impersonation of XFINITY by Defendants and their co-conspirators leads to baseless legal claims, which XFINITY has to defend; and (5) Defendants' misconduct and the harm it causes undermines XFINITY's competitive position in the digital entertainment, cable, and telecommunications industries.

60.     In addition, Defendants' and their co-conspirators' Imposter Fraud Scheme results in calls, emails, and instant messaging by confused and angry consumers to XFINITY's Customer Care department. XFINITY incurs significant costs associated with responding to, investigating, and attempting to resolve customer relations issues created by Defendants. In the process, XFINITY loses customers or potential customers who responded to Defendants' fraudulent offers, and its reputation suffers from this Imposter Fraud Scheme. XFINITY also suffers irreparable harm when confused consumers, relying on misrepresentations by Defendants and/or their co-conspirators, look to XFINITY to resolve their complaints, including reimbursing them for the money they lost or honoring the illusory promotions Defendants and/or their co-conspirators promised.

22

61.     Defendants' continuing conduct results in substantial harm to XFINITY's business reputation and goodwill, a greater likelihood of confusion, mistake, and deception as to the source of origin of XFINITY products and services unlawfully advertised by Defendants, and confusion as to what, if any, relationship exists between XFINITY and Defendants.

**COUNT ONE**
**TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**

62.     XFINITY reasserts the allegations set forth in Paragraphs 1-61 as though fully set forth herein.

63.     A business relationship, and an expectancy of business relationships, exists between XFINITY and the purchasers and prospective purchasers of its XFINITY products and services.

64.     XFINITY had a reasonable expectation of entering into and/or continuing a valid business relationship with XFINITY customers and prospective customers.

65.     There is a high probability of future economic benefit to XFINITY from these current and prospective business relationships.

66.     Defendants know of, rely on, and intentionally and unjustifiably interfere with current and prospective business relationships between XFINITY and legitimate XFINITY customers and prospective customers.

67.     Specifically, but without limitation, Defendants know that XFINITY has business relationships, and an expectancy of business relationships, with legitimate consumers of XFINITY products and services.  It is the foundation of their Scheme.

68.     Defendants interfered with these relationships by engaging in their Imposter Fraud Scheme, which includes promising free or substantially discounted XFINITY products and

23

services, discounted bill pay services, and upgraded equipment, with no intention of providing the products or services.

69.     Defendants are intentionally interfering with XFINITY's business relationships and prospective advantages through improper means and in violation of the law.

70.     Defendants engage in the acts of interference set forth herein with a conscious desire to prevent the relationships from occurring or continuing or Defendants knew that the interference was certain or substantially certain to occur from their conduct.

71.     Defendants' interference prevented XFINITY's legitimate expectancy from ripening into a valid business relationship.

72.     Defendants' acts continue to injure XFINITY's business relationships.

73.     XFINITY has been and continues to be proximately damaged from Defendants' interference with its existing or potential customer relationships.

74.     XFINITY has suffered damages because of Defendants' interference with its existing or potential customer relationships.

75.     There is no adequate remedy at law to fully compensate XFINITY for the harm caused by Defendants' tortious interference.

**COUNT TWO**
**TORTIOUS INTERFERENCE WITH CONTRACT**

76.     XFINITY reasserts the allegations set forth in Paragraphs 1-61 as though fully set forth herein.

77.     A valid and enforceable contractual relationship exists between XFINITY and its customers, the purchasers of its XFINITY products and services. The contract requires, in part, that XFINITY customers pay an agreed-upon monthly fee for the products and/or services provided by XFINITY.

78.     Defendants have knowledge of and have intentionally and unjustifiably interfered with, and/or have knowingly facilitated a conspiracy to interfere with, these contracts between XFINITY and legitimate XFINITY customers.

79.     Defendants and their co-conspirators rely on and exploit the contractual relationship between XFINITY and its customers to unlawfully obtain money based on the false promise of discounted or free XFINITY products and services or equipment upgrades. Defendants interfere with these relationships by engaging in the Imposter Fraud Scheme and causing XFINITY customers to fail to make timely account payments and/or to doubt or resent their relationship with XFINITY and to terminate their agreements.

80.     Defendants engaged in the acts of unjustifiable interference set forth herein with a conscious desire to induce breach of contract, or Defendants knew that breach of contract was certain or substantially certain to occur as a result of their conduct, defrauding XFINITY customers under the guise of XFINITY.

81.     Defendants' acts are not motivated by legitimate business reasons.

82.     XFINITY has been proximately damaged and continues to be damaged by Defendants' interference.

83.     There is no adequate remedy at law to fully compensate XFINITY for the harm caused by Defendants' tortious interference.

## COUNT THREE
## CIVIL CONSPIRACY

84.     Plaintiffs reassert the allegations set forth in Paragraphs 1-61 as though fully set forth herein.

85.     An agreement and conspiracy existed and continues to exist between and among Defendants and other co-conspirators to:

25

a.    impersonate XFINITY to the public;

b.    impersonate XFINITY customers to XFINITY;

c.    contact existing or potential XFINITY customers to offer them free or significantly discounted XFINITY products or services in exchange for money with knowledge that no services or products will be provided;

d.    gain access and make changes to accounts on XFINITY's protected computers with illegally obtained customer information from defrauded customers;

e.    steal payments from XFINITY customers due to XFINITY for services and products provided by XFINITY to the customers;

f.    launder payments, including checks, into cash; and/or

g.    resell checking and customer information obtained from XFINITY customers.

86.    Defendants' actions constitute unfair competition, tortious interference with business relationships and prospective advantage, tortious interference with contract, unjust enrichment, trademark infringement, false advertising, and violation of the federal Computer Fraud and Abuse Act, among other things.

87.    Each Defendant knowingly agreed to engage, and did engage, in one or more overt acts in pursuit of the conspiracy, as set forth with more particularity *supra*.

88.    Plaintiffs have been and continues to be proximately injured and damaged by the conspiracy and Defendants' actions in furtherance thereof.

89.    Defendants, directly or indirectly through co-conspirators, regularly and systematically misrepresented and made fraudulent statements to Plaintiffs that they were legitimate account holders or other persons lawfully authorized to access and/or make changes to customer accounts, as well as making false representations to Plaintiffs' customers.

90.     There is no adequate remedy at law to fully compensate Plaintiffs for the harm caused by Defendants' conspiracy.

## COUNT FOUR
## UNJUST ENRICHMENT

91.     Plaintiffs reassert the allegations set forth in Paragraphs 1-61 as though fully set forth herein.

92.     By masquerading as XFINITY and using the XFINITY Marks to unlawfully sell and collect payment for XFINITY products and services, Defendants have obtained benefits from Plaintiffs that cause significant harm to Plaintiffs and result in significant financial gain to Defendants.

93.     Defendants have acquired the benefits of impersonating Plaintiffs voluntarily and with full knowledge of and intent to reap those benefits.

94.     Defendants have retained the benefits under such circumstances that make it unjust and inequitable for Defendants to retain the benefits without paying Plaintiffs the value of the benefits acquired by Defendants.

95.     Defendants' retention of the benefits violates the fundamental principles of justice, equity, and good conscience.

96.     There is no adequate remedy at law to fully compensate Plaintiffs for the harm caused by Defendants' unjust enrichment.

## COUNT FIVE
## UNFAIR COMPETITION

97.     Plaintiffs reassert the allegations set forth in Paragraphs 1-61 as though fully set forth herein.

98.     Defendants have and continue to enrich themselves by impersonating XFINITY, contacting existing or potential XFINITY customers, offering free or significantly discounted

27

XFINITY services or products and equipment upgrades, taking their money, and failing to provide the promised XFINITY services, products or account credits, which constitutes unfair competition under the common law of the State of Illinois.

99.     Defendants' conduct and participation in the Imposter Fraud Scheme constitutes unfair methods of competition, unconscionable acts or practices, and/or unfair or deceptive acts or practices in violation of state law.

100.    Defendants' use of the XFINITY Marks in connection with the Imposter Fraud Scheme has caused, and will further cause, a likelihood of confusion, mistake and deception as to the source of origin of Defendants' products and services, and the relationship between Plaintiffs and Defendants. Thus, Defendants have also engaged in unfair competition with Plaintiffs by selling and/or offering, and promoting their fake XFINITY products and services with the intention of trading upon the goodwill established by Plaintiffs and are thereby misappropriating the benefits of substantial effort and money expended by Plaintiffs in establishing Plaintiffs' rights in and to the XFINITY Marks.

101.    Defendants' conduct complained of herein was and continues to be intentional, malicious, and willful, and has caused substantial harm to XFINITY.

102.    There is no adequate remedy at law to fully compensate Plaintiffs for the harm caused by Defendants' unfair competition.

**COUNT SIX**
**TRAFFICKING IN COMPUTER PASSWORDS**
**18 U.S.C. § 1030(a)(6)**

103.    XFINITY reasserts the allegations set forth in Paragraphs 1-61 as though fully set forth herein.

104.    XFINITY has the following computers: (1) password-protected ordering system; (2) national communications and computer networks; and (3) electronic customer account and

billing portal (collectively, "Protected Computers"). The Protected Computers are "computers" as that term is defined in Section 1030(e)(1) of the Computer Fraud and Abuse Act because they are electronic and/or high-speed data processing devices performing logical, arithmetic or storage functions, and include data storage facilities and/or communications facilities directly related to or operating in conjunction with such devices.

105.    XFINITY prevents unauthorized access to its Protected Computers through, among other things, the confidential codes/passwords needed to access the Protected Computers ("Security Codes").

106.    Defendants and/or their co-conspirators obtain these Security Codes through various unlawful means, including the Dark Web, socially engineering consumers, and identity theft.

107.    Through their Imposter Fraud Scheme, Defendants are knowingly trafficking in the Security Codes with the intent to defraud and harm XFINITY.

108.    Defendants and their co-conspirators use the fraudulently-obtained Security Codes to gain unauthorized access to at least one of XFINITY's Protected Computers (*i.e.*, using Security Codes fraudulently obtained from third-party sources like the Dark Web, socially-engineered consumers authorizing multifactor authentication, and identity theft to log into XFINITY password protected ordering systems and/or the XFINITY electronic customer account and billing portal to make changes to a customer's XFINITY account). This access into at least one of XFINITY's Protected Computers as part of the Imposter Fraud Scheme is not authorized.

109.    Defendants or their co-conspirators share these Security Codes among themselves and with their co-conspirators.

110.    Defendants' transfer of the Security Codes to others constitutes "trafficking" of the codes as defined in 18 U.S.C. § 1029 in that the Security Codes were transferred, or otherwise

disposed of, to others, or Defendants obtained control of the codes with intent to transfer or dispose of them.

111.    Defendants' trafficking of the Security Codes substantially affects interstate commerce and communication in that the Security Codes are trafficked over the Internet, throughout the United States, and around the world, and XFINITY's Protected Computers are used in and affect interstate commerce and communication.

112.    Defendants' unlawful trafficking of XFINITY's Security Codes has caused and will continue to cause XFINITY to suffer injury, with "damages" and "losses" – as those terms are defined in Sections 1030(e)(8) and 1030(e)(11), respectively --  substantially in excess of $5,000 over a one-year period.

113.    With respect to loss, XFINITY has spent in excess of $5,000 over a one-year period assessing its Protected Computers for damage and taking steps to prevent future unauthorized access by Defendants and/or their co-conspirators.

114.    With respect to loss, XFINITY has also spent in excess of $5,000 over a one-year period, investigating Defendants' intrusions into XFINITY's Protected Computers, assessing the possible impairment to the integrity of its Protected Computers, and conducting damage assessments regarding Defendants' collection and dissemination of Security Codes.

115.    Moreover, with respect to loss, XFINITY has spent in excess of $5,000 over a one-year period in costs to discover Defendants' identities and/or the method by which Defendants access XFINITY's Protected Computers without authorization.

116.    With respect to damage, by unlawfully accessing XFINITY's Protected Computers and collecting and disseminating the illegally acquired Security Codes, Defendants and their co-conspirators have substantially impaired the integrity of XFINITY's Protected Computers in an

amount in excess of $5,000. Moreover, Defendants' actions have impaired XFINITY's means of controlling the quality of its products and services.

117. Defendants' activities constitute trafficking in computer passwords in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(6).

118. Defendants' conduct is intentional, malicious, fraudulent, and willful.

119. Pursuant to 18 U.S.C. § 1030(g), XFINITY is entitled to maintain this civil action against Defendants to obtain compensatory damages and injunctive and other equitable relief for the reasons identified above, and because Defendants' conduct involves at least one of the factors identified in 18 U.S.C. § 1030(c)(4)(A)(i), including the factor set forth in subclause (I): the loss to XFINITY and XFINITY customers as a result of Defendants' conduct during any one-year period aggregated at least $5,000 in value.

**COUNT SEVEN**
**UNAUTHORIZED ACCESS**
**18 U.S.C. § 1030(a)(5)(C)**

120. XFINITY reasserts the allegations set forth in Paragraphs 1-61 and 104-119 as though fully set forth herein.

121. XFINITY's Protected Computers are "protected computers" as that term is defined in Section 1030(e)(2)(B) of the Computer Fraud and Abuse Act because they are used in interstate commerce and communications.

122. XFINITY's Protected Computers hold confidential information, are connected to the Internet, and assist in providing federally-regulated communications services.

123. In furtherance of their Imposter Fraud Scheme, Defendants and/or their co-conspirators use fraud and misrepresentation to access at least one of XFINITY's Protected Computers. As such, Defendants' access to XFINITY's Protected Computers using fraudulently obtained credentials or identities is unauthorized. Further, in using fraud or deception to access

31

customer accounts and/or XFINITY's billing systems, Defendants' and/or their co-conspirators' access at least one of XFINITY's Protected Computers is unauthorized.

124.     Defendants' unauthorized access of XFINITY's Protected Computers has caused and will continue to cause XFINITY to suffer injury, with "damages" and "losses" – as those terms are defined in Sections 1030(e)(8) and 1030(e)(11), respectively – substantially in excess of $5,000 over a one-year period.

125.     Defendants' activities constitute unauthorized access in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(5)(C).

**COUNT EIGHT**
**UNAUTHORIZED ACCESS WITH INTENT TO DEFRAUD**
**18 U.S.C. § 1030(a)(4)**

126.     XFINITY reasserts the allegations set forth in Paragraphs 1-104 and 99-125 as though fully set forth herein.

127.     Defendants knowingly, intentionally, and with the intent to defraud, facilitate the unauthorized access into at least one of XFINITY's Protected Computers.

128.     Defendants and their co-conspirators obtain monetary value through their unlawful access into at least one of XFINITY's Protected Computers.

129.     Defendants' activities constitute unauthorized access in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(4).

**COUNT NINE**
**FEDERAL TRADEMARK INFRINGEMENT**
**15 U.S.C. 1114 [§32(1) of the Lanham Act]**

130.     Comcast Corporation reasserts the allegations set forth in Paragraphs 1-61 as though fully set forth herein.

131.     Defendants' aforementioned conduct constitutes use of certain federally registered XFINITY Marks without authorization in connection with their Imposter Fraud Scheme.

132.     Defendants' use of certain federally registered XFINITY Marks in connection with their Imposter Fraud Scheme has caused, and will continue to cause, a likelihood of confusion, mistake and deception as to the source of origin of Defendants' infringing products, and the relationship between Comcast Corporation and Defendants.

133.     Defendants' unauthorized use of certain federally registered XFINITY Marks is likely to continue in the future, causing irreparable damage to the business, reputation and goodwill of Comcast Corporation.

134.     Defendants' use of certain federally registered XFINITY Marks in connection with their Imposter Fraud Scheme constitutes a misappropriation of Comcast Corporation's distinguishing and identifying federally registered trademarks that were created through significant effort and expense by Comcast Corporation, and its authorized licensees, over a long period of time.

135.     Defendants' use of certain federally registered XFINITY Marks evokes an immediate, favorable impression or association and constitutes a false representation that the products and business of Defendants have some connection, association or affiliation with Comcast Corporation or its authorized licensees. It is likely to mislead the public into believing that Defendants' products and services originate from, are affiliated with, or are sponsored, authorized, approved or sanctioned by Comcast Corporation or its authorized licensees.

136.     Defendants, in committing the foregoing acts in commerce, have damaged, and will continue to damage, Comcast Corporation and the reputation and goodwill of Comcast Corporation, and have been unjustly enriched and will continue to unjustly enrich themselves at the expense of Comcast Corporation.

137. Comcast Corporation is without an adequate remedy at law to redress such acts, and will be irreparably damaged unless Defendants are preliminarily and, thereafter, permanently enjoined from committing and continuing to commit such acts.

138. Defendants' aforesaid acts constitute willful infringement of Comcast Corporation's aforementioned federally registered trademarks in violation of 15 U.S.C. §1114.

139. Defendants are engaged in and continue to engage in the alleged activities knowingly, willfully and deliberately, warranting an assessment of exemplary damages and an award of, *inter alia*, Comcast Corporation's lost profits, Defendants' gross profits, and Comcast Corporation's attorneys' fees. Defendants' conduct also warrants a finding that this is an exceptional case.

**COUNT TEN**
**FEDERAL COMMON LAW TRADEMARK**
**INFRINGEMENT AND FALSE ADVERTISING**
**15 U.S.C. § 1125 (a)(1)(A) and (B) [§43(a) of the Lanham Act]**

140. Plaintiffs reassert the allegations set forth in Paragraphs 1-61 as though fully set forth herein.

141. Defendants' aforementioned conduct constitutes use of at least one of the XFINITY Marks without authorization in connection with their Imposter Fraud Scheme.

142. Defendants' use of at least one of the XFINITY Marks in connection with their Imposter Fraud Scheme has caused, and will further cause, a likelihood of confusion, mistake and deception as to the source of origin of Defendants' infringing products, and the relationship between XFINITY and Defendants.

143. Defendants' unauthorized use of at least one of the XFINITY Marks is likely to continue in the future, causing irreparable damage to the business, reputation and goodwill of Plaintiffs.

144. Defendants' use of at least one of the XFINITY Marks in connection with their Imposter Fraud Scheme constitutes a misappropriation of Plaintiffs' distinguishing and identifying trademarks that were created through significant effort and expense by Plaintiffs over a long period of time.

145. Defendants' use of at least one of the XFINITY Marks evokes an immediate, favorable impression or association and constitutes a false representation that the products and business of Defendants have some connection, association or affiliation with Plaintiffs. It is likely to mislead the public into believing that Defendants' products and services originate from, are affiliated with, or are sponsored, authorized, approved or sanctioned by Plaintiffs.

146. Defendants, in committing the foregoing acts in commerce, have damaged, and will continue to damage, Plaintiffs and the reputation and goodwill of Plaintiffs, and have been unjustly enriched and will continue to unjustly enrich themselves at Plaintiffs' expense.

147. Plaintiffs are without an adequate remedy at law to redress such acts, and will be irreparably damaged unless Defendants are preliminarily and, thereafter, permanently enjoined from committing and continuing to commit such acts.

148. Defendants' use of at least one of the XFINITY Marks in commercial advertising and/or promotion misrepresents the nature, characteristics, and/or qualities of their infringing products and/or services. Such advertising and/or promotion is false and/or misleading and deceives, or has the capacity to deceive, consumers. The deception and misrepresentations have a material effect on purchasing decisions and affect interstate commerce.

149. Defendants' activities constitute false designation of origin, false descriptions and representations, and false advertising in commerce in violation of § 43(a) of the Lanham Act, 15 U.S.C. §1125(a)(1)(A) and (B).

150.    Defendants knew or should have known that they have no legal right to use the XFINITY Marks.

151.    Defendants are engaged in and continue to engage in the alleged activities knowingly, willfully and deliberately, justifying the assessment of exemplary damages and an award of, *inter alia*, Plaintiffs' lost profits, Defendants' gross profits, the cost of corrective advertising, and Plaintiffs' attorneys' fees.  Defendants' conduct also warrants a finding that this is an exceptional case.

**COUNT ELEVEN**
**CONTRIBUTORY TRADEMARK INFRINGEMENT**

152.    Plaintiffs reassert the allegations set forth in Paragraphs 1-61 as though fully set forth herein.

153.    By misappropriating and using at least one of the XFINITY Marks, Defendants knowingly aid and enable distributors and/or sellers of their products and services to market them to members of the general public in a way that infringes the XFINITY Marks by placing in the hands of distributors and/or sellers an instrument of consumer deception.

154.    Defendants' unlawful, unauthorized, and unlicensed advertising and/or sale of XFINITY products and services has contributed to the creation of express and implied misrepresentations that the products and services sold by Defendants and/or their co-conspirators, were created, authorized or approved by Plaintiffs.

155.    Defendants' conduct leads to post-sale confusion by causing consumers in the United States who purchase products or services from Defendants or their co-conspirators to believe that they are purchasing legitimate XFINITY products or services.

156.    Defendants' conduct constitutes contributory infringement in violation of the Trademark Act.  Defendants' conduct is intentional, malicious, and willful.

157.    Plaintiffs have been damaged and continue to suffer damage as a result of Defendants' Imposter Fraud Scheme.

158.    There is no adequate remedy at law to fully compensate Plaintiffs for the harm caused by Defendants' Imposter Fraud Scheme.

159.    Plaintiffs are without an adequate remedy at law to redress such acts, and will be irreparably damaged unless Defendants are preliminarily and, thereafter, permanently enjoined from committing and continuing to commit such acts.

160.    Defendants are engaged in and continue to engage in the alleged activities knowingly, willfully and deliberately, justifying the assessment of exemplary damages and an award of, *inter alia*, Plaintiffs' lost profits, Defendants' gross profits, and Plaintiffs' attorneys' fees.  Defendants' conduct also warrants a finding that this is an exceptional case.

**COUNT TWELVE**
**FEDERAL TRADEMARK DILUTION**
**15 U.S.C. § 1125 (c) [Lanham Act §43(c)]**

161.    Comcast Corporation reasserts the allegations set forth in Paragraphs 1-61 as though fully set forth herein.

162.    The XFINITY Marks are distinctive and famous marks within the meaning of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

163.    The XFINITY Marks are famous throughout Illinois and the United States.

164.    The XFINITY Marks became distinctive and famous prior to the Defendants' use of their infringing marks and acts, as alleged herein.

165.    Defendants' acts, as alleged herein, have diluted and will, unless enjoined, continue to dilute and are likely to dilute the distinctive quality of Comcast Corporation's famous Marks.

166. Defendants' acts, as alleged herein, have tarnished and will, unless enjoined, continue to tarnish, and are likely to tarnish the XFINITY Marks by undermining and damaging the valuable goodwill associated therewith.

167. Defendants' acts, as alleged herein, are intentional and willful, in violation of Section 43(c)(1) of the Lanham Act.

168. Comcast Corporation is without an adequate remedy at law to redress such acts, and will be irreparably damaged unless Defendants are preliminarily and, thereafter, permanently enjoined from committing and continuing to commit such acts.

169. Defendants are engaged in and continue to engage in the alleged activities knowingly, willfully and deliberately, justifying the assessment of exemplary damages and an award of, *inter alia*, Comcast Corporation's lost profits, Defendants' gross profits, and Comcast Corporation's attorneys' fees. Defendants' conduct also warrants a finding that this is an exceptional case.

**COUNT THIRTEEN**
**COMMON LAW TRADEMARK INFRINGEMENT**

170. Plaintiffs reassert the allegations set forth in Paragraphs 1-61 as though fully set forth herein.

171. Defendants' aforementioned conduct constitutes use of at least one of the XFINITY Marks without authorization in connection with their Imposter Fraud Scheme.

172. Defendants' use of at least one of the XFINITY Marks in connection with their Imposter Fraud Scheme has caused, and will further cause, a likelihood of confusion, mistake, and deception as to the source of origin of Defendants' infringing products and the relationship between Plaintiffs and Defendants.

173. Defendants' unauthorized use of at least one of the XFINITY Marks is likely to continue in the future, all to the great and irreparable damage to Plaintiffs.

174. Defendants' use of at least one of the XFINITY Marks in connection with their Imposter Fraud Scheme constitutes a misappropriation of Plaintiffs' distinguishing and identifying trademarks that were created through significant effort and expense by Plaintiffs over a long period of time.

175. Defendants' use of at least one of the XFINITY Marks evokes an immediate, favorable impression or association and constitutes a false representation that the products, services, and business of Defendants have some connection, association or affiliation with Plaintiffs. It is intended to mislead the trade and public into believing that Defendants' products and services originate from, are affiliated with, or are sponsored, authorized, approved or sanctioned by Plaintiffs.

176. Defendants, in committing the foregoing acts in commerce, have damaged, and will continue to damage, Plaintiffs and the reputation and goodwill of Plaintiffs, and have been unjustly enriched and will continue to unjustly enrich themselves at Plaintiffs' expense.

177. Plaintiffs are without an adequate remedy at law to redress such acts, and will be irreparably damaged unless Defendants are preliminarily and, thereafter, permanently enjoined from committing and continuing to commit such acts.

178. Defendants' activities constitute common law trademark infringement under the laws of the State of Illinois.

179. Defendants knew or should have known that they have no legal right to use the XFINITY Marks.

180. Plaintiffs are entitled to exemplary and punitive damages by reason of Defendants' willful, reckless, deliberate, and intentional conduct.

## COUNT FOURTEEN
## COMMON LAW FRAUD AND FRAUDULENT MISREPRESENTATION

181.    XFINITY reasserts the allegations set forth in Paragraphs 1-61 as though fully set forth herein.

182.    As part of the Imposter Fraud Scheme, each of the Defendants, directly or indirectly through co-conspirators, regularly and systematically misrepresents and makes fraudulent statements to XFINITY that they are legitimate XFINITY account holders or other persons lawfully authorized to access and/or make changes to XFINITY customer accounts.

183.    The nature of the Scheme requires Defendants to make false representations to both XFINITY and its customers.  In each instance, to add credibility to their Scheme, after deceiving XFINITY customers into providing their confidential account information and/or authoring multifactor authentication requests, Defendants transmit that information to XFINITY, posing as the customer or a legitimately authorized representative of the customer.

184.    As described *supra*, Defendants began routinely masquerading as XFINITY to XFINITY customers since at least June 2022, then, using information obtained from the customers, they falsely represent to XFINITY that they are or are lawfully authorized by those XFINITY customers to access, and in some cases, make changes to or order equipment on, customer accounts. As another example, on November 1 2023, Defendants falsely represented themselves as XFINITY, collected identifying information from an investigator for XFINITY, including phone and account numbers and directed the investigator to approve a multifactor authentication request, and then Defendants presented that information and falsely-obtained authorization to XFINITY to access the investigator's XFINITY accounts.

185.    Upon information and belief, each Defendant participated in intentionally defrauding XFINITY and its legitimate customers to conduct the Imposter Fraud Scheme.

186. Defendants intend for XFINITY and existing or potential customers to rely on their misrepresentations, and/or the misrepresentations of their co-conspirators.

187. XFINITY's reliance on the misrepresentations of Defendants and their co-conspirators was reasonable and justifiable under the circumstances, namely, because Defendants had the account verification information or multifactor authentication approval from the account holder that allowed them to access one or more of XFINITY's Protected Computers for improper purposes.

188. XFINITY has been damaged and continues to suffer damages as a result of Defendants' actions.

189. There is no adequate remedy at law to fully compensate XFINITY for the harm caused by Defendants' fraud.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all triable issues.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request that the Court enter the following relief:

(a) judgment against Defendants and in favor of Plaintiffs on all claims;

(b) a finding that Defendants' acts and participation in the Scheme were willful, intentional, and/or in malicious disregard of Plaintiffs' lawfully protected rights;

(c) an order awarding Plaintiffs their compensatory, consequential, statutory, special, treble, exemplary, and punitive damages including, without limitation, their lost profits, loss of goodwill, and damage to their reputation, cost of corrective advertising, Defendants' gross profits, as provided by law, together with pre and post-judgment interest;

41

(d)     a preliminary and, thereafter, permanent injunction that includes, but is not limited to, enjoining Defendants and all of their past and present agents, representatives, officers, directors, successors, assigns, parents, subsidiaries, affiliates, related companies, predecessors-in-interest, employees, heirs, personal representatives, beneficiaries, relatives, and all other persons or entities acting or purporting to act for them or on their behalf, including, but not limited to, any corporation, partnership, proprietorship or entity that is affiliated or associated with Defendants or Defendants' representatives, agents, assigns, parent entities, employees, independent contractors, associates, servants, affiliated entities, and any and all persons and entities in active concert and participation with Defendants who receive notice of the injunction from:

     i.     engaging in or soliciting, directing, requesting, or facilitating others to engage in the conduct described in the Complaint as the Imposter Fraud Scheme against XFINITY and its actual and potential customers;

     ii.     holding themselves out as being associated with, employed by or on behalf of, or acting as an agent, representative, affiliate, contractor or authorized partner of XFINITY or facilitating or knowingly assisting other persons or entities to do so;

     iii.     contacting existing or potential XFINITY customers by phone, email, text message, voicemail or any other method with the intent to engage in any aspect of the Imposter Fraud Scheme;

     iv.     acquiring, advertising or selling any Comcast and/or XFINITY products or services;

     v.     soliciting, accepting, retaining or transmitting any payment, in whatever form, from an XFINITY customer, including but not limited to, payments intended to be made to XFINITY for a new or existing XFINITY account;

vi.     laundering any payment received in connection with the Imposter Fraud Scheme;

vii.     advertising, using, selling or otherwise sharing or transmitting XFINITY customer credit card, check or other financial information;

viii.     attempting to or accessing XFINITY's Protected Computer System – as defined in the Complaint – including, but not limited to, through protected and confidential computer passwords or multifactor authentication obtained by defrauding consumers, purchasing or otherwise acquiring the information on the dark web or by any other means;

ix.     acquiring, purchasing, selling, advertising, aggregating, supplying, and/or soliciting, directly or indirectly, actual or potential XFINITY customer information, XFINITY account information or the confidential codes/passwords needed to access XFINITY's Protected Computers;

x.     communicating with employees or representatives of XFINITY, whether in person, by phone, through a website or via a third party;

xi.     advertising for, soliciting or compensating individuals to engage in the Imposter Fraud Scheme;

xii.     training, educating, coaching, guiding, or instructing anyone on methods to defraud XFINITY or its actual or potential customers;

xiii.     misappropriating that which rightfully belongs to XFINITY, its customers, or potential customers, or in which XFINITY or its customers or potential customers have an interest;

xiv.     using the XFINITY Marks or any other trademark, service mark, trade name and/or trade dress owned or used by XFINITY or its subsidiaries, parents, and affiliates, now or in the future, or that is a counterfeit, copy, simulation, confusingly similar variation,

43

or colorable imitation of the XFINITY's Marks without XFINITY's prior written authorization;

xv.       engaging in any activity that infringes XFINITY's rights in or is likely to dilute the distinctiveness of the XFINITY Marks;

xvi.       engaging in unfair competition with XFINITY;

xvii.       making or displaying any statement, representation, or depiction that is likely to lead the public or the trade to believe that (i) Defendants' products or services are in any manner approved, endorsed, licensed, sponsored, authorized, or franchised by or associated, affiliated, or otherwise connected with XFINITY, or (ii) XFINITY's products or services are in any manner approved, endorsed, licensed, sponsored, authorized, or franchised by or associated, affiliated, or otherwise connected with Defendants;

xviii.       using, or authorizing any third party to use, in connection with business, goods or services, a false description, representation or designation of origin, or any marks, names, words, symbols, devices or trade dress that falsely associates such business, goods, and/or services with XFINITY, or tends to do so; and

xix.       Receiving any compensation, directly or indirectly, whether in money, in kind, or otherwise, for any of the acts proscribed in subparagraphs above;

(e)       an order requiring Defendants to remove all offending websites and online offers of and deliver to XFINITY all materials, electronic or otherwise, in the possession of Defendants, bearing any of the XFINITY Marks or any reproduction, counterfeit, copy, or colorable imitation thereof, and all means of making the same;

(f)       an order requiring Defendants, their agents, servants, employees, successors and assigns, and all other persons acting in concert or conspiracy or otherwise affiliated with Defendants to engage in corrective advertising, as necessary;

44

(g)    an order finding that this is an exceptional case under the Lanham Act;

(h)    an order awarding Plaintiffs their costs and reasonable attorneys' fees pursuant to

15 U.S.C. § 1117(a), and any other applicable provision of law; and,

(i)    such other or further relief as the Court may deem just and proper.


Dated: December 23, 2024              Respectfully submitted,

                                      /s/  *Sean. G. Wieber*
                                      Sean G. Wieber (IL Bar ID: 6294080)
                                      A. Matthew Durkin (IL Bar ID: 6325610)
                                      Winston & Strawn LLP
                                      35. W. Wacker Drive
                                      Chicago, IL 60601
                                      Tel: (312) 558-5600
                                      swieber@winston.com
                                      mdurkin@winston.com

                                      *Trial Counsel for Plaintiffs Comcast Cable
                                      Communications, LLC d/b/a XFINITY and Comcast
                                      Corporation*


                                      /s/  *Stacey K. Sutton*
                                      Stacey K. Sutton (N.D. Ill. Identification No. 289530)
                                      Amanda R. Jesteadt (N.D. Ill. Identification No. 73149)
                                      Wiley Rein LLP
                                      2050 M St NW
                                      Washington, DC 20036
                                      Tel: (202) 719-7000
                                      ssutton@wiley.law
                                      ajesteadt@wiley.law

                                      *Counsel for Plaintiffs Comcast Cable Communications,
                                      LLC d/b/a XFINITY and Comcast Corporation*